## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

RICKY R. RATLIFF,

             Plaintiff,

v.                                No. 6:22-cv-01185-PGB-DAB

WYCLIFFE ASSOCIATES, INC.,

             Defendant.

---

## DEFENDANT'S AMENDED MOTION TO DISMISS
### (Amended to include Local Rule 3.01(g) certification.)

Defendant, WYCLIFFE ASSOCIATES, INC., pursuant to Rule 12(b)(6), Fed. R. Civ. P., and Local Rule 3.01, moves the Court to dismiss the Complaint (Doc. 1) of Plaintiff, RICKY R. RATLIFF, for failure to state a claim upon which relief can be granted. Wycliffe shows the Court as follows in support of this motion:

## MEMORANDUM OF LAW

Both the First Amendment and the Religious Freedom Restoration Act (RFRA) require dismissal of Ratliff's Complaint. Wycliffe is a Christian ministry dedicated to the work of translating the Bible for all people groups in the world.[1] Wycliffe holds to a biblically Christian view of the world, including human sexuality, and requires the employees furthering Wycliffe's mission to affirm its biblical worldview and maintain its high standards for spirituality and the Christian faith. Wycliffe employed Ratliff to

---

[1] Defendant, Wycliffe Associates, Inc., is not the same corporation as, and should not be confused with, Wycliffe Bible Translators, Inc.

develop software solutions to directly advance Wycliffe's central Bible translation mission. Ratliff, however, repudiated Wycliffe's biblical worldview and standards by identifying himself in opposition to their Christian faith and doctrine by seeking Wycliffe's approval of benefits for his same-sex spouse. Ratliff's repudiation of Wycliffe's religious standards, in part, resulted in his termination. Independent of Ratliff's repudiation of Wycliffe's biblically Christian doctrine and creed, Ratliff and five other employees were laid off (four before and one after) due to the uncertainties and financial effects of COVID restrictions in 2020. The Complaint admits these facts establishing Wycliffe's affirmative and complete defenses to Ratliff's Title VII claim under the First Amendment ministerial exception and under RFRA. Thus, Ratliff's Complaint fails to establish a Title VII employment discrimination claim as a matter of law. There are no factual disputes to resolve, and Ratliff has no cognizable cause of action. The Court should dismiss the Complaint with prejudice.

## I.  PLEADED FACTS ESTABLISHING WYCLIFFE'S FIRST AMENDMENT AND RFRA DEFENSES.

In addition to Ratliff's allegations in the Complaint itself, exhibits "attached to the complaint are treated as part of the allegations," *Berry v. Keller*, 157 Fed. Appx. 227, 228 (11th Cir. 2005), and "are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion." *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985); *see also Gilliam v. U.S. Dep't of Veterans Affairs*, 2:16-CV-255-FTM-29CM, 2017 WL 6344207, at *1 & n.3, *3 (M.D. Fla. Dec. 12, 2017) (considering attachments to complaint in dismissing Title VII claim on Rule 12(b)(6) motion).

Moreover, the contents of a complaint exhibit control over conflicting allegations in the complaint. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). Thus, Wycliffe's Position Statement to the EEOC in response to Ratliff's discrimination charge (Doc. 1-3, "Position Statement"), which Ratliff attached to his Complaint and incorporated into his allegations (Compl., Doc. 1, ¶¶ 15, 21 & Ex. A), must be considered part of Ratliff's pleaded allegations for purposes of Wycliffe's motion to dismiss.

### A. Wycliffe's Religious Mission and Hiring Standards.

Wycliffe is a Christian Bible translation ministry whose mission is to "advance the work of Bible translation around the world." (Pos. Statement 3). Formed in 1967 to ensure the faithful and speedy translation of the Bible into other languages, Wycliffe's goal today is to provide every people group in the world access to the Bible in their own language by the end of 2025. (Pos. Statement 2). To achieve this,

> Wycliffe accelerates the work of Bible translation by empowering national Bible translators to provide God's Word in their own language; partnering with the local church to guide and guard translation work, harnessing their passion and desire for God's Word; and engaging people from all around the world to provide resources, technology, training, and support for Bible translation. Wycliffe is directly involved with speeding Bible translation by providing technology, training, resources, logistics, networking, expertise, volunteers, discipleship, church planting and support . . . .

(Pos. Statement 3).

To succeed in its religious mission to communicate the Christian faith to the world through translation of the Bible into all languages, Wycliffe maintains for its staff "high standards for spirituality and the Christian faith," and requires all employees and

volunteers to be in agreement with Wycliffe's published Statement of Faith as a nonnegotiable condition of working on Wycliffe's core mission of Bible translation. (Pos. Statement 2–3 & Ex. 2 (PageID 22).) The first declaration in Wycliffe's Statement of Faith—belief "in the divine inspiration and consequent authority of the whole canonical Scriptures" (Pos. Statement 2 & Ex. 2 (PageID 22)—communicates Wycliffe's adherence to all of the Bible. Thus, in employment, Wycliffe desires "to recognize all those called by the Lord" and "maintains high standards for spirituality, health and personal qualifications." (Pos. Statement 5 & Ex. 5 (PageID 26).)

To legally facilitate its Christian mission, Wycliffe operates as a religious nonprofit corporation in the state of Florida and a tax-exempt church under sections 501(c)(3), 509(a)(1), and 107(b)(1)(A)(i) of the IRC. (Pos. Statement 3.) Wycliffe also delimits its Equal Employment and Volunteer Opportunity Policy to uphold its distinctively Christian standards, clarifying, "As a religious organization, Wycliffe Associates is exempt from certain discrimination laws related to religious and creed rights." (Pos. Statement 5 & Ex. 5 (PageID 26).)

### B. Ratliff's Employment in Wycliffe's Central Religious Mission and Termination for Repudiating Wycliffe's Religious Employment Standards.

Wycliffe hired Ratliff to the position of Software Developer II on February 24, 2020. (Pos. Statement 3.) The primary job responsibility for Ratliff's position was to "proactively develop software solutions to advance Bible Translation" by developing both "internal business systems and external field translation tools and systems." (Pos. Statement 3 & Ex. 3 (PageID 23).) The position also required Ratliff, in addition to

software development process and technical responsibilities, to "[c]ontribute creativity and energy to the task of accelerating Bible Translation." (*Id.*) The personal qualifications for the position required Ratliff to have "a personal relationship with Jesus Christ" and to "sense a call from God to ministry." (Pos. Statement 3 & Ex. 3 (PageID 24).) In accepting the position, Ratliff acknowledged receipt of the Wycliffe employee Handbook (Pos. Statement 5 & Ex. 6 (PageID 27)), which included Wycliffe's Statement of Faith and religious employment policies. (Pos. Statement 3 & Exs. 2 (PageID 22), 5 (PageID 26).)

On April 6, 2020, about six weeks after beginning his employment (and within his 90-day trial period),[2] Ratliff identified himself to Wycliffe management as homosexual and requested approval of spousal benefits for his same-sex spouse. (Pos. Statement 4 n.1; Compl., ¶¶ 18–19.) At an April 13, video conference meeting with Wycliffe management, Wycliffe advised Ratliff of the termination of his employment due, in part, to his identifying as homosexual and avowing same-sex marriage.[3] (Pos. Statement 3–4 & n.1, & Ex. 4 (PageID 25).)

---

[2]  Ratliff was hired under Wycliffe's At-Will Employment Status Police and 90-Day New Hire Period Policy. (Pos. Statement 3–7 & Exs. 7–9 (PageID 28–31).)

[3]  Wycliffe's additional reason for terminating Ratliff's employment was the widespread impact of the COVID pandemic on Wycliffe's finances, as a result of which Wycliffe terminated five other employees—four before and one after Ratliff's termination. (Pos. Statement 3–4.) While this fact alone undercuts Ratliff's claim, the First Amendment ministerial exception and the federal Religious Freedom Restoration Act (RFRA) require the Complaint to be dismissed as a matter of law.

Ratliff filed with the EEOC a charge of sex discrimination based on sexual orientation, to which Wycliffe responded on August 12, 2020. (Pos. Statement 1.) On July 8, 2022, Ratliff commenced this action against Wycliffe alleging sex discrimination based on sexual orientation. (Compl., ¶ 25.)

## II. ARGUMENT: THE FIRST AMENDMENT MINISTERIAL EXCEPTION AND RFRA REQUIRE DISMISSAL OF RATLIFF'S COMPLAINT AS A MATTER OF LAW.

Wycliffe's termination of Ratliff from a position advancing Wycliffe's core religious mission, based on Ratliff's failure to meet Wycliffe's religious employment standards, is not actionable discrimination under Title VII. Both the First Amendment ministerial exception and RFRA bar Ratliff's claims as a matter of law.

### A. The Ministerial Exception Bars Ratliff's Claims as a Matter of Law.

#### 1. The ministerial exception protects a religious institution's autonomy to hire and fire employees whose key roles are essential to the institution's religious mission.

United States courts have long recognized a "'ministerial exception' to laws governing the employment relationship between a religious institution and certain key employees." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020); *see also Sanchez v. Cath. Foreign Soc. of Am.*, 82 F. Supp. 2d 1338, 1344 (M.D. Fla. 1999) ("The Eleventh Circuit also follows this doctrine of non-interference."). The exception is based on the principle that the Religion Clauses of the First Amendment protect "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe*, 140 S. Ct. at 2055 (cleaned up). "The Establishment Clause prevents the

6

Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 184 (2012). "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

Thus, the rule binds courts "to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* "Numerous courts have held that the term 'religious institution,' in this context, can include religiously affiliated schools, hospitals, and corporations." *Shaliehsabou*, 363 F.3d at 310. The exception was dubbed "ministerial," apparently, "because the individuals involved in pioneering cases were described as 'ministers.'" *Id.* For the rule to apply, however, the employee need not be clergy or the leader of a religious congregation, *see Hosanna-Tabor*, 565 U.S. at 190, or have any particular "ministerial" title or credential. *See Our Lady of Guadalupe*, 140 S. Ct. at 2063–64, 2067–68 (rejecting circuit court's "distorted analysis" placing undue significance on lack of clerical title and formal religious training); *see also, e.g.*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 940–41 (7th Cir. 2022) ("This court has consistently applied the ministerial exception in employment cases brought by teachers, music

directors, press secretaries, and organists, among other positions."); *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299 (4th Cir. 2004) (holding ministerial exception applicable to Kosher dietary inspector employed by religiously affiliated Jewish nursing home); *Sanchez*, 82 F. Supp. 2d at 1344 ("the exception has also been extended to lay employees of religious institutions."). Rather, the rule broadly protects a religious institution's autonomy to hire and fire "the individuals who play certain key roles" which are "essential to the institution's central mission." *Id.* at 2060. "What matters, at bottom, is what an employee *does.*" *Id.* at 2064 (emphasis added). And "[w]hat an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform." *Starkey,* 41 F.4th at 941.

### 2. The ministerial exception applies to Ratliff's position because it was essential to Wycliffe's central mission to communicate the Christian faith to unreached people through Bible translation.

In the two Supreme Court cases applying the ministerial exception, the Court held it applicable to teachers employed by church-affiliated schools because of the teachers' importance to their churches' mission to share the faith. In *Hosanna-Tabor*, the Court reasoned that the teacher's "job duties reflected a role in conveying the Church's message and carrying out its mission" where she was charged with "leading others toward Christian maturity and teaching faithfully the Word of God, the Sacred Scriptures, in its truth and purity" and "performed an important role in transmitting the Lutheran faith to the next generation." 565 U.S. at 192. In *Our Lady of Guadalupe*, the Court surveyed the centrality of religious instruction "to many faiths practiced in

the United States" to "show[] the close connection that religious institutions draw between their central purpose and educating the young in the faith." 140 S. Ct. at 2064–66.

The same considerations apply all the more to Wycliffe and require application of the ministerial exception to Ratliff's position. Like the schools in *Hosanna-Tabor* and *Our Lady of Guadalupe*, Wycliffe's central mission is to share the Christian faith—albeit on a worldwide scale. (Pt. I.A, *supra*.) Wycliffe's specific mission is to facilitate the faithful teaching of the Bible[4] around the world by first faithfully translating the Bible into the languages of unreached people groups around the world—to transmit the Christian faith to new generations who will, in turn, transmit the faith to their next generations. (Pt. I.A, *supra*.) Where people groups have no Bibles available in their own languages, Wycliffe's ministry of introducing the Christian faith to those people groups precedes and enables the later work of religious schools to keep the faith. And Ratliff's primary job responsibilities, to "develop software solutions to advance Bible Translation" and "accelerat[e] Bible Translation," including with "translation tools and systems" for Bible translators in the field (Pt. I.B, *supra*), were essential to Wycliffe's central Bible translation mission. Moreover, just as the teacher in *Hosanna-Tabor* "held herself out as a minister of the Church by accepting the formal call to religious service, according to its terms," 565 U.S. at 191, Ratliff held himself out as a

---

[4]   "Surely the place of the Bible as an instrument of religion cannot be gainsaid . . . ." *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 (1963).

*minister* of Wycliffe's religious mission by accepting the express conditions of his employment requiring him to "sense a call from God to *ministry*" (Pos. Statement 3 & Ex. 3 (PageID 24) (emphasis added)), and also requiring him to meet Wycliffe's "high standards for spirituality and the Christian faith," affirm belief "in the divine inspiration and consequent authority of the whole canonical Scriptures," and have "a personal relationship with Jesus Christ." (Pt. I.A, B, *supra*.) Thus, under the Supreme Court's precedents, the First Amendment ministerial exception bars Ratliff's claims as a matter of law.[5]

## B. RFRA Separately Requires Dismissal of Ratliff's Claims as a Matter of Law.

### 1. RFRA applies to private lawsuits.

The federal Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (RFRA), also bars Ratliff's Title VII claims. RFRA provides that "Government shall not substantially burden a person's exercise of religion" unless the burden, as applied to the person, "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. A person may assert RFRA "as a claim or defense in a judicial proceeding." *Id.* And, while the Eleventh Circuit has not considered whether RFRA

---

[5]   Ratliff cites the Supreme Court decision in *Bostock v. Clayton County Georgia*, 140 S. Ct. 1731 (2020), as support for his claim of sex discrimination based on sexual orientation. (Compl., ¶¶ 13–14.) But *Bostock* affirmed the ministerial exception and provides Ratliff no way around it. *See* 140 S. Ct. at 1754 ("This Court has also recognized that the First Amendment can bar the application of employment discrimination laws 'to claims concerning the employment relationship between a religious institution and its ministers.'" (quoting *Hosanna-Tabor*, 565 U.S. at 188).)

is available as a defense in a federal lawsuit brought by a non-government plaintiff, the Second and DC Circuits have held that it does. *See Hankins v. Lyght*, 441 F.3d 96, 103–104 (2d Cir. 2006); *E.E.O.C. v. Cath. Univ. of Am.*, 83 F.3d 455, 467–70 (D.C. Cir. 1996); *see also* Sara Lunsford Kohen, *Religious Freedom in Private Lawsuits: Untangling When RFRA Applies to Suits Involving Only Private Parties*, 10 Cardozo Pub. L. Pol'y & Ethics J. 43 (2011).

In *Catholic University,* a Title VII sex discrimination case brought by the EEOC and a former employee of the university, the D.C. Circuit explained, "RFRA expressly states that it 'applies to all Federal . . . law, and the implementation of that law, whether statutory or otherwise." 83 F.3d 455 (modification in original). Thus, the court concluded, RFRA "has, in effect, incorporated a statutory 'compelling interest' test into Title VII that Catholic University is entitled to invoke" against the claims of both the EEOC and its former employee. 83 F.3d 455, 468.

In *Hankins*, an ADEA case, the Second Circuit similarly explained,

> There is little caselaw addressing the issue whether the RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion. The RFRA's language surely seems broad enough to encompass such a case. The statutory language states that it "applies to all federal law, and the implementation of that law," and that a defendant arguing that such a law substantially burdens the exercise of religion "may assert [a violation of the RFRA] as a . . . defense in a judicial proceeding." This language easily covers the present action.

441 F.3d at 103 (footnote and citations omitted) (modification in original). Furthermore, the *Hankins* court reasoned, "The ADEA is enforceable by the EEOC as

well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." Thus, the court held, "the RFRA's provisions . . . allow parties who . . . claim that a federal statute, like the ADEA, substantially burdens the exercise of their religion to assert the RFRA as a defense to any action asserting a claim based on the ADEA." *Hankins*, 441 F.3d at 104.[6]

The Supreme Court reached the same conclusion in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020). In response to the "fear that complying with Title VII's requirement . . . may require some employers to violate their religious convictions," the Court answered, "[b]ecause RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." *Id.* at 1753–54. Thus, given the sound reasoning of *Catholic University* and *Hankins*, and the endorsement of the Supreme Court in *Bostock*, this Court should hold that RFRA provides Wycliffe a defense to Ratliff's Title VII claim.

---

[6]   *See also* Kohen, *supra*, at 4; *Hankins*, 441 F.3d at 103 n.4 (collecting cases that "seem to have assumed without discussion that the RFRA may be asserted as a defense by a private party against another private party"); *id.* ("Bankruptcy courts have also generally permitted a private-party defendant to assert a RFRA defense against a Chapter 7 trustee" (citing cases), but, "A bankruptcy trustee is arguably 'acting under color of law' and therefore falls within the RFRA's definition of 'government.'").

## 2. Forcing Wycliffe to affirm Ratliff's sexual orientation and same-sex marriage would substantially burden Wycliffe's exercise of religion without legal justification.

Under RFRA, once Wycliffe shows a substantial burden on its religious exercise, Ratliff must demonstrate the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; *see also Burwell*, 573 U.S. at 705 (internal citations omitted). Ratliff cannot meet this high standard, so his Title VII claim is barred.

Forcing Wycliffe to violate its core religious beliefs by employing an individual who openly repudiates those beliefs constitutes a substantial burden on Wycliffe's religious exercise. Wycliffe expressly binds itself and its employees to the "authority of the whole canonical scriptures" (Pos. Statement 2), which includes the Bible's clear doctrines on human sexuality, gender, family, and sin.[7] Forcing Wycliffe to affirm

---

[7]   *Genesis* 1:27 (ESV) ("So God created man in his own image, in the image of God he created him; male and female he created them."); *Genesis* 2:24 (ESV) ("Therefore a man shall leave his father and his mother and hold fast to his wife, and they shall become one flesh."); *Matthew* 9:5 (same); *Mark* 10:8 (same); *Ephesians* 5:31 (same); *Leviticus* 18:22 (ESV) ("You shall not lie with a male as with a woman; it is an abomination."); *Romans* 1:24-27 (teaching same-sex relations contrary to nature); *1 Corinthians* 6:9–10 (ESV) ("Or do you not know that the unrighteous will not inherit the kingdom of God? Do not be deceived: neither the sexually immoral, nor idolaters, nor adulterers, nor men who practice homosexuality, nor thieves, nor the greedy, nor drunkards, nor revilers, nor swindlers will inherit the kingdom of God."); *Revelation* 21:8 (ESV) ("'But as for the cowardly, the faithless, the detestable, as for murderers, the sexually immoral, sorcerers, idolaters, and all liars, their portion will be in the lake that burns with fire and sulfur, which is the second death.'"); *Revelation* 22:14–15 (ESV) ("Blessed are those who wash their robes, so that they may have the right to the tree of life and that they may enter the city by the gates. Outside are the dogs and

Ratliff's contrary views and conduct would have "the effect of enabling or facilitating the commission of an immoral act" under Wycliffe's religious standards, which would undoubtedly and substantially burden Wycliffe's ability to "conduct business in accordance with [its] religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014).

Ratliff has not pleaded and cannot prove a compelling interest that could justifying forcing Wycliffe to abide Ratliff's repudiation of Wycliffe's express religious standards, based on the religious text on which Wycliffe's core translation mission is based. At most, Ratliff presents "the interest of society in the enforcement of employment discrimination statutes." *Hosanna-Tabor*, 565 U.S. at 196. While such an interest may be important in a general sense, however, free exercise of religion is the "guarantee [that] lies at the heart of our pluralistic society"—so much so that Congress designed RFRA to be a "super statute, displacing the normal operation of other federal law," and superseding even Title VII's important mandates when proper. *Bostock*, 140 S. Ct. at 1754. Ratliff can plead no set of facts under RFRA's compelling interest standard that could justify the burden on Wycliffe's religious exercise he demands.

---

sorcerers and the sexually immoral and murderers and idolaters, and everyone who loves and practices falsehood."); *Ephesians* 5:1–3 (ESV) ("Therefore be imitators of God, as beloved children. And walk in love, as Christ loved us and gave himself up for us, a fragrant offering and sacrifice to God. But sexual immorality and all impurity or covetousness must not even be named among you . . . .").

## CONCLUSION

For the foregoing reasons the Court should grant Wycliffe's motion and dismiss Ratliff's Complaint with prejudice.

## Local Rule 3.01(g) Certification

Prior to filing this amended motion, Wycliffe's undersigned counsel conferred with Plaintiff's counsel. Plaintiff opposes the requested relief.

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Hugh C. Phillips
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@LC.org
hmihet@LC.org
rgannam@LC.org
hphillips@LC.org

*Attorneys for Defendant,*
*Wycliffe Associates, Inc.*

15