UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RICKY R. RATLIFF,

                       **Plaintiff,**

v.                                **Case No: 6:22-cv-1185-PGB-RMN**

WYCLIFFE ASSOCIATES, INC.,

                       **Defendant.**

_____/

## ORDER

This cause comes before the Court on Defendant Wycliffe Associates, Inc.'s ("**Defendant**") Amended Motion to Dismiss for Failure to State a Claim (Doc. 18 (the "**Motion**")) and Plaintiff Ricky R. Ratliff's ("**Plaintiff**") response in opposition (Doc. 22 (the "**Response**")). Upon consideration, the Motion is due to be denied.

## I.    BACKGROUND[1]

This lawsuit arises from alleged employment discrimination based on sexual orientation. (*See generally* Doc. 1 (the "**Complaint**")).

Defendant operates a Bible translation company that boosts a mission to "advanc[e] the work of Bible translation around the world." (*Id*. ¶ 5; Doc. 1-3, p. 2).

---

[1]    This account of the facts comes from Plaintiff's Complaint (Doc. 1), which the Court accepts as true for the purposes of this Motion. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

On or about February 24, 2020,[2] Defendant employed Plaintiff, a homosexual male, as a Software Developer II in its Information Technology Department. (Doc. 1, ¶¶ 11–12; Doc. 1-3, pp. 3, 13, 17).

Summarily, Plaintiff was "[r]esponsible for the full software development lifecycle within a team context." (Doc. 1-3, p. 13). More specifically, according to Defendant's employee handbook, Plaintiff's job duties consisted of the following:

- In collaboration with the Director of Application Development, proactively develop software solutions to advance Bible Translation.
- Work with internal and external customers/users to identify, understand, and document their needs.
- Work with team members and vendors to design, develop, document and implement custom solutions.
- Computer programming, including but not limited to JavaScript, jQuery, C#, PHP, Python, REST APIs, and a variety of other environments and technologies as needed.
- Leverage experience and develop relationships to assist and mentor team members.
- Contribute creativity and energy to the task of accelerating Bible Translation.

(*Id.*). While working at Defendant's company, Plaintiff's "Peer Relationships" included other software developers and database developers. (*Id.*).[3] Required

---

[2]   The Court notes that the date on which Plaintiff began his employment is unclear. The Complaint asserts that Plaintiff's start date was February 24, *2002*; supporting attachments, however, lead the Court to believe it was actually February 24, *2020*. (*Compare* Doc. 1, ¶ 11, *with* Doc. 1-3, pp. 3, 17, 19). In ruling on a motion to dismiss, courts may consider exhibits attached to a complaint, and "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir.2007)). Notably, Plaintiff's job acceptance letter indicates that his "start date will be on or about February 24, *2020*." (Doc. 1-3, p. 19 (emphasis added)). Moreover, Plaintiff signed the employee handbook, agreeing to its terms, on February 24, *2020*. (*Id.* at p. 17). Accordingly, the Court will presume Plaintiff's start date was in 2020, not 2002.

[3]   According to Plaintiff's job acceptance letter, he was to directly report to Craig Oliver, the Application Development Director. (Doc. 1-3, p. 19).

education or experience largely entailed proficiency in application development, such as a "[d]emonstrated capacity to quickly learn new systems, skills, languages, and programming environments" and "[a]t least [five] years' experience developing applications." (*Id.* at pp. 13–14).[4] Notably, "[p]riority [was] given to applicants with computer science or other related degrees." (*Id.* at p. 14). However, "linguistics, Bible translation, or other relevant subject areas was a plus but not required." (*Id.*).

On April 2, 2020, while working in his role as Software Developer II, Plaintiff married his current husband. (Doc. 1, ¶ 17). Shortly thereafter, on April 6, 2020, Plaintiff emailed Defendant's Human Resources Director Terri Mwangi (the "**HR Director**") to inform her of his newly minted marital status and to request an update of his health insurance. (*Id.* ¶ 18). After the HR Director asked Plaintiff for supporting documentation, Plaintiff complied by submitting his marriage certificate to confirm the name of his male spouse. (*Id.* ¶ 19). On April 13, 2020, a mere seven days after Plaintiff's request, Defendant terminated Plaintiff, admitting that Defendant had made this decision, at least in part, "in light of [his] sexual orientation." (*Id.* ¶¶ 20–21; Doc. 1-3, p. 4).

Ultimately, on July 8, 2022, Plaintiff initiated this lawsuit, asserting a sole cause of action for sex discrimination under Title VII of the Civil Rights Act of 1964

---

4    The Court recognizes the list of generic "personal qualifications" but finds them less relevant for purposes of the instant motion to dismiss. (*See id.* at p. 14).

("**Title VII**"), 42 U.S.C. § 2000e *et seq.* (Doc. 1, ¶¶ 23–28).[5] Subsequently, Defendant moved to dismiss Plaintiff's Complaint (Doc. 18), and Plaintiff responded in opposition (Doc. 22). Accordingly, the matter is now ripe for review.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual

---

[5]   Initially, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, and Defendant responded thereto. (*See id.* at pp. 1–10).

allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## III.   DISCUSSION

Defendant moves to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. (*See generally* Doc. 18). Specifically, Defendant challenges Plaintiff's Title VII claims on two primary fronts. (*See id.*). First, Defendant contends that Plaintiff qualifies as a minister and thus, the First Amendment's "ministerial exception" requires dismissal of his claims as a matter of law. (*Id.* at pp. 6–10). Second, Defendant attests that the Religious Freedom Restoration Act ("**RFRA**"), 42 U.S.C. § 2000bb to 2000bb-4, separately bars Plaintiff's employment discrimination claims. (*Id.* at pp. 10–14). The Court disagrees with both arguments and will address its reasoning in turn.

### A.   First Amendment Ministerial Exception

Defendant first contends that the ministerial exception to the First Amendment precludes Plaintiff's Title VII claims as a matter of law. (*Id.* at pp. 6–10). At this stage, the Court disagrees.

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). Specifically, "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012). Thus, "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.* at 181.

Accordingly, in 2012, the Supreme Court officially adopted what lower courts had long coined the "ministerial exception" to laws governing the employment relationship between a religious institution and certain key employees.[6] *Id.* at 188. Essentially, the Supreme Court reasoned that "[r]equiring a church [or religious organization] to accept or retain an unwanted minister . . . intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* Thus, courts uniformly embraced the ministerial exception to protect the autonomy of religious organizations "with respect to internal management decisions that are essential to

---

[6] Whether Defendant classifies as a religious organization for purposes of the ministerial exception is not at issue here, and thus, the Court will not address it.

the institution's central mission." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. "Without such [autonomy], a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id.* All in all, the purpose of the ministerial exception is to preserve a religious organization's independent authority in ecclesiastical matters and insulate them from employment discrimination suits brought by their ministers. *See id.* at 2060–61; *Hosanna-Tabor*, 565 U.S. at 188–90.

Although "reluctant . . . to adopt a rigid formula for deciding when an employee qualifies as a minister," the Supreme Court in *Hosanna-Tabor* highlighted "four relevant circumstances" that impact the classification: 1) boasting a ministerial title, "with a role distinct from that of most of [the religious organization's] members"; 2) working in a position that reflects "a significant degree of religious training followed by a formal process of commissioning"; 3) holding oneself out "as a minister of the [religious organization] by accepting the formal call to religious service" or "claiming certain tax benefits"; and 4) performing job duties that "reflect[] a role in conveying the [religious organization's] message and carrying out its mission." 565 U.S. at 191–94; *see Our Lady of Guadalupe*, 140 S. Ct. at 2062–64. Years later, in *Our Lady of Guadalupe*, the Supreme Court expanded the scope of the ministerial exception, emphasizing that "[w]hat matters, at bottom, is what an employee does." 140 S. Ct. at 2064.

Defendant avers that the ministerial considerations present in *Hosanna-Tabor* and *Our Lady of Guadalupe* similarly exist here. (*See* Doc. 18, pp. 6–10). However, such is not the case.

In *Hosanna-Tabor*, the plaintiff worked as a "called" teacher at one of defendant's Lutheran schools offering a "Christ-centered education." 565 U.S. at 177–78. To achieve "called" status,[7] the plaintiff completed a "colloquy program" at a Lutheran institution, taking courses in theological study, obtaining the endorsement of the local Synod district, and passing a related exam. *Id.* Once "called," the plaintiff received her "diploma of vocation," designating her with the title "Minister of Religion, Commissioned." *Id.* Although plaintiff taught various subjects, most relevant was the religion class she taught four days a week. *Id.* Moreover, the plaintiff led her students in prayer and devotional exercises daily, attended weekly chapel service, and led the schoolwide service roughly twice a year. *Id.* Ultimately, the Court found that "in light of these [aforementioned] considerations—the formal title given [plaintiff] by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church"—plaintiff classified as a minister covered by the ministerial exception. *Id.* at 191–92.

---

[7]   To provide context, the Missouri Synod—the second largest Lutheran denomination in America—classified teachers into two categories, "called" and "lay." *Hosanna-Tabor*, 565 U.S. at 177–78. Lay teachers were neither required to be Lutheran nor to be trained by the Synod. *Id.*

Similarly, years later in *Our Lady of Guadalupe*, both plaintiffs were teachers at Catholic elementary schools. 140 S. Ct. at 2056, 2058. Neither was bestowed the title of "minister," and neither acquired significant religious training. *Id.* at 2055, 2066. However, both plaintiffs prayed with their students, attended Mass with them, and provided classroom instruction in religion. *Id.* at 2066. In other words, the plaintiffs' religious institutions likewise "entrusted [them] most directly with the responsibility of educating their students in the faith." *Id.* Accordingly, the Supreme Court noted that *Hosanna-Tabor* purposefully did not impose a "rigid formula" for classifying ministers—instead, courts were "called on . . . to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the [ministerial] exception." *Id.* Thus, considering plaintiffs' "core responsibilities as teachers of religion were essentially the same" as in *Hosanna-Tabor*, the court concluded the ministerial exemption applied. *Id.* at 2066–69.

The circumstances presented here are markedly different from those in *Hosanna-Tabor* and *Our Lady of Guadalupe*. Arguably none of the aforementioned factors from *Hosanna-Tabor* weigh in favor of finding Plaintiff falls under the purview of the ministerial exception. *See Hosanna-Tabor*, 565 U.S. at 191–94. Moreover, a holistic consideration of "what Plaintiff does," as clarified in *Our Lady of Guadalupe*, only further supports the Court's conclusion that Plaintiff does not qualify as a minister. *See* 140 S. Ct. at 2064.

First, Defendant did not bestow Plaintiff with a ministerial title or anything even remotely similar—in fact, his explicit job title classified him as a "Software Developer II." (Doc. 1-3, 13); *see Hosanna-Tabor*, 565 U.S. at 191. While Plaintiff held a position "distinct from that of most of [Defendant's] members," the role's specificity was correlated with technological—not ministerial—proficiency. (*See* Doc. 1-3*,* pp. 13–14); *Hosanna-Tabor*, 565 U.S. at 191. Moreover, Plaintiff's required technological experience, job description, and associated tasks further contribute to the conclusion that Plaintiff's title adequately encapsulates his true role at Defendant's organization—a software developer. (Doc. 1-3, pp. 13–14); *see Our Lady of Guadalupe*, 140 S. Ct. at 2063–65 (emphasizing that the *Hosanna-Tabor* plaintiff's circumstances, such as her academic requirements and formal approval process, evinced the practical importance of her ministerial title). Thus, neither Plaintiff's title nor the fundamental nature of his position persuades the Court that he was anything but a secular employee.

Second, Plaintiff simply did not work in a position that "reflected a significant degree of religious training followed by a formal process of commissioning." *Hosanna-Tabor*, 565 U.S. at 191; (*see* Doc. 1-3, pp. 13–14). In fact, to the Court's knowledge, Plaintiff had no religious training, nor was any required pursuant to his job description. (*See generally* Docs. 1, 1-3). Essentially, the sole "training" pertinent to his position involved experience with application development and an ability to adapt to dynamic programming environments. (*See* Doc. 1-3, pp. 13–14). Explicitly, "[p]riority [was] given to applicants with computer

science or other related degrees," but "linguistics, Bible translation, or other relevant subject areas was a plus [and] not required." (*Id.* at p. 14). Thus, Plaintiff's position did not reflect any degree of religious training, much less subsequent formal recognition.

Third, Plaintiff never held himself out "as a minister of [Defendant's organization] by accepting the formal call to religious service" or "claiming certain tax benefits." *Hosanna-Tabor*, 565 U.S. at 191–92; (*see* Docs. 1, 1-3). Defendant contends, however, that Plaintiff "held himself out as a *minister* of [Defendant's] religious mission by accepting the express conditions of his employment requiring him to 'sense a call from God to ministry'" and "meet [Defendant's] 'high standards for spirituality and the Christian faith.'" (Doc. 18, pp. 9–10 (emphasis in original)). Alas, the Court disagrees—contractually agreeing to maintain a sense of spirituality and faith is a far cry from accepting a job akin to a minister. [8] The buck has to stop somewhere. Not to mention, the vague personal qualifications in Plaintiff's employment contract can be interpreted a litany of ways—as can Christianity and as can spirituality.

In any event, Defendant also states in its employee handbook—within close textual proximity to where Defendant claims it "maintains high standards for spirituality—that "each individual will be considered on his/her own merits, without regard to race, color, sex, national origin" and so forth. (Doc. 1-3, p. 16).

---

[8]   In the employment description for Plaintiff's role, Defendant delineated a list of "Personal Qualifications" that include having "a personal relationship with Jesus Christ" and sensing "a call from God to ministry." (Doc. 1-3, pp. 13–14).

Shortly thereafter, though, the handbook includes the caveat, "As a religious organization, [Defendant] is exempt from certain discrimination laws related to religious and creed rights." (*Id.* at p. 18). Thus, altogether, it seems Defendant's contractual provisions are not only in contention with each other, but also with Defendant's present argument. (*See id.*). Nevertheless, simply inserting such a blanket exception into an employment contract will not insulate Defendant from lawful claims. Accordingly, viewing allegations in the light most favorable to Plaintiff, the Court finds it plausible that Plaintiff did not hold himself out as a minister by way of personal qualifications in his employment contract.

Lastly, Plaintiff did not perform job duties that "reflected a role in conveying the [religious organization's] message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192; (*see* Doc. 1-3, pp. 13–14). Defendant avers that Plaintiff's primary job duties were essential to Defendant's central mission to share the Christian faith with unreached people groups around the world. (Doc. 18, p. 9). Accordingly, Defendant characterized Plaintiff as "facilitat[ing] the faithful teaching of the Bible . . . by first faithfully translating the Bible." (*Id.*). Plaintiff, however, argues that being tasked with software development for the purpose of Bible translation does not equate to being "active in conveying the message of the Bible." (Doc. 22, p. 10). The Court agrees.

In *Hosanna-Tabor*, the court found that plaintiff's job duties "reflected a role in conveying [defendant's] message and carrying out its mission" because plaintiff, "[a]s a source of religious instruction, . . . performed an important role in

transmitting the Lutheran faith to the next generation." 565 U.S. at 192; *see Our Lady of Guadalupe*, 140 S. Ct. at 2064. Likewise, in *Our Lady of Guadalupe*, the plaintiffs' "core responsibilities as teachers of religion were essentially the same," both "entrusted most directly with the responsibility of educating their students in the faith." 140 S. Ct. at 2066–69. Here, however, Plaintiff was charged with no such duties. Plaintiff neither was tasked with religious instruction nor participated in any sort of religious education or liturgical service. (*See* Doc. 1-3, pp. 13–14). Simply put, Plaintiff was seemingly hired for his technological aptitude. (*See id.*). Accordingly, Plaintiff's role was to employ his knowledge to develop software, not to act as a source of religious conveyance. (*See id.*). While the software's purpose may have been to translate the Bible, Plaintiff himself was not doing so. (*See id.*). Further, Plaintiff's direct interactions involved other software and database developers—not the individuals seeking out Defendant's mission. (*See id.*). Thus, the plaintiffs in *Hosanna-Tabor* and *Our Lady of Guadalupe* played a far different role in "conveying [their religious organizations'] message and carrying out [their] mission" than did Plaintiff. *Hosanna-Tabor*, 565 U.S. at 192; *Our Lady of Guadalupe*, 140 S. Ct. at 2064.

To conclude, the Court by no means attempts to precisely specify what factual circumstances fall within the parameters of the ministerial exception. However, at bottom here, Plaintiff is a software developer, with no idiosyncratic religious title, background, education, or function. *Our Lady of Guadalupe*, 140 S. Ct. at 2064 ("What matters, at bottom, is what an employee does."); (*see* Doc. 1-3).

As such, the Court finds Plaintiff's role plausibly falls outside the intended scope of the ministerial exception.

## B.   Religious Freedom Restoration Act

Irrespective of the ministerial exception, Defendant avers that RFRA precludes Plaintiff's Title VII claims as a matter of law. (Doc. 18, pp. 10–14). Essentially, the crux of the parties' contention surrounds the application of RFRA to lawsuits between private parties. (*See id.*; Doc. 22, pp. 11–19). While Defendant maintains that RFRA surely applies to private suits, Plaintiff argues the contrary. (*See* Doc. 18, pp. 10–14; Doc. 22, pp. 11–19). Ultimately, the Court agrees with Plaintiff that RFRA is not applicable to private lawsuits.

The statutory language of RFRA provides that the "*[g]overnment* shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "*it* demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a) to (b) (emphasis added). With regards to judicial relief, RFRA denotes that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*." 42 U.S.C. § 2000bb-1(c) (emphasis added). Accordingly, the parties debate whether the explicit textual implication of the "government" confines RFRA's application to

suits in which the government is a party. (*See* Doc. 18, pp. 10–14; Doc. 22, pp. 11–19).

The Court acknowledges that a circuit split exists regarding RFRA's application to lawsuits involving only private parties. *Compare Listecki v. Off. Comm. Of Unsecured Creditors*, 780 F.3d 731, 736–37 (2015) (does not apply), *and Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (2006) (does not apply), *and Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (2010) (does not apply), *with Hankins v. Lyght*, 441 F.3d 96, 114–15 (2d Cir. 2006) (applies). Notably, however, one of "the only circuit[s] to analyze the issue and hold [that RFRA applies to private lawsuits] did so in the limited situation [in which] the government could have been a party, over a strong dissent, and has [since] retreated from its holding." *Listecki*, 780 F.3d at 737; *see Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) (expressing "doubts" about the court's prior holding in *Hankins* because of RFRA's plain language and related policy reasons but declining to revisit the "waived" issue). Nevertheless, the Eleventh Circuit has not squarely addressed the issue. Thus, the Court weighs the reasoning of other circuits to reach its conclusion.

Based on the plain text of RFRA, its legislative history, and the persuasive reasons offered by sister courts, the Court finds RFRA does not apply to lawsuits in which the government is not a party. *See Listecki*, 780 F.3d at 736–37 ("The plain language is clear that RFRA only applies when the government is a party."); *Tomic*, 442 F.3d at 1042 (noting that "RFRA is applicable only to suits to which the

government is a party" and that to decide otherwise would be "unsound"); *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, Civ. No. 21-CV-3161, 2023 WL 2355891, at *5 (Mar. 3, 2023) (slip copy) ("[T]he weight of authorities holds that [] RFRA does not apply in cases where . . . the government is not a party.").

As various courts have pointed out, the statutory construction of RFRA establishes a burden-shifting test in which the *government* must make a showing following plaintiff's demonstration of a substantial burden. *Listecki*, 780 F.3d at 736; *McGill*, 617 F.3d at 409–11. Naturally, however, "the government cannot meet its burden if it is not party to the suit. A private party cannot step into the shoes of the 'government' . . . [when] the statute explicitly says that the 'government' must make this showing." *Listecki*, 780 F.3d at 736 (citations omitted). Moreover, the statute allows for judicial relief against the *government*—thus, none can be afforded if the government is not a party. *Id.* at 736–37 ("The [statutory] relief is clearly and unequivocally limited to that from the 'government.'"). Altogether, the plain language of RFRA alone clearly evinces that Congress did not intend for RFRA to apply to private suits. *See id.* at 736–37; *McGill*, 617 F.3d at 409–11.

For the aforementioned reasons, the Court finds that RFRA does not apply to private suits and consequently, does not bar Plaintiff's claims in the matter at hand.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Amended Motion to Dismiss (Doc. 18) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on May 26, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties